28866. GRIFFIN *v.* TAYLOR.

DECIDED JULY 16, 1941.

*Jesse J. Gainey,* for plaintiff in error.

*Alexander & Jones, Roy M. Lilly,* contra.

STEPHENS, P. J.   T. F. Taylor, doing business as T. F. Taylor Fertilizer Works, brought suit against C. T. Griffin in which he alleged that the defendant was indebted to him $2626.41 on an account, a copy of which was attached to the petition.   The itemized account attached showed that various lots of fertilizer were sold by the plaintiff to the defendant, and that embraced therein were certain fertilizers known as "8-4-6," "4-8-6," "5-7-5," and "3-10-10."   The defendant denied owing the plaintiff for any of these lots of fertilizers, but did not deny being indebted for the other kinds of fertilizer shown by the itemized account to have been purchased by him from the plaintiff.   In substance, the defendant alleged that all fertilizers itemized on the account as indicated above were wholly worthless, and "the price therefore is without consideration and the consideration shown in said account for same has wholly failed," because such fertilizers were in such mechanical condition that they could not be distributed under the crops.   The defendant alleged that such lots of fertilizer, between the time they were hauled from the plaintiff's factory and the time they were to be distributed, a period of from two to five weeks, had hardened into lumps; that because of that condition they could not be distributed properly to crops and were wholly worthless to increase the productiveness thereof; that the implied warranty in the sale of such lots of fertilizer, that they were reasonably suited to be distributed under crops to increase the productiveness thereof, had been breached, and that by reason thereof the defendant was not indebted to the plaintiff in any amount for these particular lots of fertilizer.   The defendant further alleged that he had incurred certain expenses in the use of the fertilizer which he claimed to be worthless for land rent to put them on, for seed for planting

crops on the land, for labor in putting the fertilizer out, and planting and cultivating the crops. The answer itemized these various items of expense, and further alleged that the defendant had been damaged to the extent of these expenses by the plaintiff's breach of warranty in the sale of such kinds of fertilizer, less the value of the crops which he actually produced on the land. In his answer the defendant deducted from the total of the purchase-price of the various items of fertilizer which he admitted, and for which he did not deny owing the plaintiff, the total damages claimed, and prayed for a judgment against the plaintiff for the difference.

The case proceeded to trial and there was evidence from which the jury were authorized to find that the grades or kinds of fertilizer, claimed by the defendant to have been defective and worthless, after they had been purchased by the defendant and placed in dry and rain-proof storage houses, due to a defect in the manner in which such fertilizers were manufactured and mixed, became, through no fault of the defendant, hardened into lumps, and therefore unsuitable and unfit for use; that is, such fertilizer had to be broken up so it could be distributed in the fertilizer distributors; that some of it he was unable to distribute in the distributors at all, and that such fertilizer did not, on account of its defective condition increase the productiveness of the land on which it was distributed. The defendant introduced evidence tending to show that after he purchased the fertilizer and conveyed it to his farms he discovered that it was in a hardened condition, that it could not be used in the distributors, that he notified the plaintiff of this fact and the plaintiff stated that he wanted him to try the fertilizer a little longer, and insisted that there might be an improvement in the fertilizer, and stated that he would adjust the matter. The defendant testified that when he was putting out this fertilizer he did not know and could not tell that it "had no value at all," or he would "not have put out a sack of it." The defendant introduced evidence showing the difference in the kind of crops and the yield thereof on land on which he had attempted to place the fertilizers purchased from the plaintiff and on the other land of the same kind and crops of the same kind on which he had placed other fertilizers.

The jury were authorized to find that all crops of the defendant under which he had undertaken to use the fertilizer purchased from

the plaintiff which had hardened into lumps were not benefited at all thereby. Relatively to the fertilizers claimed by the defendant to be defective he testified as follows: "From my knowledge of fertilizers I would say it had green phosphate in it, and when it goes through that chemical reaction the amount of it that sets hardens in lumps. As it went through the chemical reaction it hardened, and part of it would be one color and part would be another color, so that it was streaked. I did not know of this trouble until I went to put out the fertilizer. . . Each of those places where it was stored was absolutely dry. Nothing happened to the fertilizer after it reached my barns to cause it to harden. It did not get wet. When it was delivered there was nothing about it that would cause me to know that it might harden or to suspect that it was not all right." He further testified: "Each lot of the fertilizer that was put to the cabbage was in the same condition as I have described. The land was a good grade of land. The fertilizers did not add any productiveness to the crop. The land was properly prepared. . . I gave them the very best cultivation and had fairly good seasons. . . I saw the fertilizer was worthless. . . The fertilizer put under the watermelons was in the same lumpy condition. We put it out by hand, but we had to break it up in small pieces in order to get it where we could put it out. . . The watermelon land was prepared as good as any land could be. I have grown watermelons for twenty years. This crop started off fine. It was well cultivated and had fair seasons. The fertilizer did not increase the productiveness of the land planted in watermelons. The land was a good grade. . . I put 172 sacks of that fertilizer under bright leaf tobacco on 40 acres of land. That land was properly prepared. It was well cultivated. We had as good a stand of tobacco as I ever got. The fertilizer was hard and we could not put it out regular, and had to beat it up to get it in the distributor. The season was good on tobacco. I produced $1540 worth of tobacco on that 40 acres. It cost me $1.50 per ton to put fertilizer out, and about $2 per ton to get it in shape to put it out. One field of that tobacco was planted along by the side of another field of tobacco with another brand of fertilizer. The tobacco with the other fertilizer was good. The other fertilizer was in good shape. It was pulverized and could be put out properly. The tobacco where the Taylor fertilizer was put out was not regu-

lar.  There were yellow streaks, and some of it was black.  The tobacco where the other fertilizer was put was smooth and level. When the tobacco was gathered and put in the barn we could tell the difference.  The good tobacco was pretty and yellow, and the other was spotted and black.  That bad tobacco was from the land fertilized with the Taylor fertilizer.  The top grade of tobacco that year brought 20 to 29 cents.  The top grades of tobacco fertilized with the Taylor fertilizer brought 8, 10, and 12 cents.  Our other top grade brought 23, 24, and 25 cents.  . .  Then there were lots of tobacco grown with Taylor's fertilizer that we graded out and threw away.  I put 100 sacks of Taylor's fertilizer under 40 acres of cotton.  That land was well prepared and we had fair seasons.  That fertilizer was lumpy and hard and in the same condition as the other that I have explained.  We could not get it in the distributor.  . .  The balance of the fertilizer was used under corn.  I made a mighty poor crop.  There was one 40-acre field of corn that I did not think was worth gathering.  . .  The seasons were fair.  It was well worked; the land was properly prepared.  The fertilizer was hard to distribute.  I compared the corn fertilized with Taylor's fertilizer with some that was not fertilized at all and there was no difference that I could tell.  The land was the same grade, in the same field."  There was evidence from which the jury could find that such fertilizers did not increase the productiveness of the land on which they were distributed, and that the crops planted on land whereon these fertilizers were distributed were not benefited thereby.

The defendant offered evidence to show that he put 301 sacks of such fertilizer to 186 acres of cabbage; that he incurred a total expense on that crop for land rent, cabbage plants and labor; that the total value of the crop of cabbage produced was $1600 and that he had a loss of the cabbage crop, because of the use of such fertilizer, of $1066.  He offered similar evidence to show that he had a loss of $183 on a watermelon crop of 18 acres.  He offered similar evidence to show that he had a loss of $460 on a 40-acre tobacco crop.  He offered similar evidence to show that he sustained a loss of $260 on a cotton crop of 40 acres.  All this evidence was excluded on the objection of the plaintiff that it did not constitute any part of the proper measure of damage.

The jury returned a verdict for the plaintiff for the full amount

sued for. The defendant filed a motion for new trial, and by amendment complained of the exclusion by the court of evidence offered by him. He also assigned error on certain excerpts of the court's charge. The motion for new trial was denied and the defendant excepted.

■ The court did not err in excluding testimony offered by the defendant to show the expenses incurred by him, consisting of land rent, labor, plants, seed, etc., in producing certain crops with the alleged worthless fertilizer purchased of the plaintiff, and to show the value of such crops. This testimony was offered to show that the cost of producing the crops, under which the defendant used the alleged worthless fertilizer, exceeded the value of such crops. The net loss sustained by the grower on crops under which worthless fertilizer is used is not recoverable by the grower from the seller of such fertilizer as damages on account of the sale thereof. The failure of the defendant to make a profit on the crops under which he used the alleged worthless fertilizer is too remote to be the basis of damages for a breach of the warranty that the fertilizer was reasonably suited to the use intended. A seller of commercial fertilizer does not guarantee or warrant that the crops under which the fertilizer sold by him is used will yield to the buyer a profit on the market. The defendant, in a suit for the purchase-price of worthless fertilizer, may, in addition to defeating recovery of the purchase-price, recover of the seller damages actually and directly sustained as a result of the use of such fertilizer, and capable of exact computation, such as expenses of cartage or haulage, storage, and distribution, including preparation for distribution. In the case of *Leitner* v. *Goodwin & Bell*, 60 *Ga.* 148 the court held that "If the fertilizer was worthless" the purchasers "had the legal right to recover for the sale of a worthless article, and the measure of damages was the principal and interest of the $175 paid, with the expense of hauling the worthless article and putting it in the ground, and the general allegation of damage from the breach of the contract is sufficient to cover expense of hauling and putting in the worthless manure." Likewise in *Clark* v. *Neufville*, 46 *Ga.* 261, the Supreme Court said: "We will not say that the difference between the price paid, and the value of the unsound article at the time and place of sale, is the only damages that may be recovered. That is the measure of the direct damages. But if there

be also indirect damages, growing directly out of the transaction, capable of computation with reasonable certainty, they may also be recovered." Also see *Butler* v. *Moore,* 68 *Ga.* 780 (45 Am. R. 508) ; *Snowden* v. *Waterman,* 105 *Ga.* 384 (31 S. E. 110) ; *Comer Co.* v. *Joyner,* 32 *Ga. App.* 661 (124 S. E. 356).

■ A seller of commercial fertilizer must deliver to his vendee a commodity which fulfills the warranty implied by law that it is reasonably fitted for the use contemplated by the parties, and also fulfills the warranty, required by statute, that it contains chemical ingredients of the guaranteed analysis. There is no written contract between the parties here for the sale of fertilizer, and the law imposes on the seller a warranty to the buyer that the fertilizer sold is merchantable and reasonably suited to the use intended, that is, to fertilize the lands and increase their productiveness. In *Wilcox* v. *Hall,* 53 *Ga.* 635, it was held : "A seller of fertilizers warrants that the article is merchantable and reasonably suited to the use intended. He warrants that it is a manure, that it is reasonably suited for giving additional capacity to land to produce a crop." See also *Wilcox* v. *Owens,* 64 *Ga.* 601; Swift & Co. *v.* Aydlett, 192 N. C. 416 (135 S. E. 141). Code, § 5-1117, provides that no commercial fertilizer shall be offered for sale which is in a bad mechanical condition.

There is no contention in the present case that the fertilizers did not measure up to the chemical analysis required by law and indicated on the particular brands. The fact that they were not deficient in chemical analysis or ingredients would not prevent the defendant from recovering any damages which he might sustain by reason of the fertilizers' being otherwise defective, whereby, after delivery, and without any fault on the part of the defendant, by reason of the improper manufacture or mixing thereof, such fertilizers hardened into lumps and got into a bad mechanical condition and therefore were not reasonably suited for the purpose of fertilizing the land. In *Wilcox* v. *Owens,* supra, it was held : "A guano note which contains the clause 'guano sold and guaranteed under analysis of Dr. Means, inspector, Savannah, which analysis has been submitted to me,' does not by implication exclude the defense that the fertilizer is not reasonably suited to the purpose for which it was sold." It follows that the court erred in charging the jury as follows : "I further charge you that the plaintiff has

brought this suit, which is a suit for the purchase-price of certain commercial fertilizers which were purchased by certain trade brands and chemical analysis specified by the buyer, as alleged. I therefore charge you that if you find that the buyer received the commercial fertilizers which he specified, and that they were not deficient in the chemical analysis or ingredients which he specified, then there would be no breach of warranty on the part of the seller, and he would be entitled to recover for the sales price agreed upon at the time of the sale. I charge you further that where a known or specified kind of fertilizer is ordered, even from the manufacturer of the article, although it is stated by the purchaser to be required for a particular purpose, still if the article called for is furnished, there seems to be no warranty implied that it will answer the particular purpose intended by the buyer. Under an agreement to sell certain brand of fertilizer the seller is said to warrant the fertilizer to contain the particular ingredients of that brand, but there is no warranty implied that it will produce good results."

This charge expressly excluded any consideration by the jury of an implied warranty that the fertilizer was suitable for fertilizing crops, and tended to confine the jury to the consideration only of the warranty that the fertilizer was of the chemical analysis represented by the seller. In view of the fact that there was no contention that the fertilizers were deficient in chemical analysis, and there was no evidence tending to show that there was any shortage of chemical analysis or ingredients in such fertilizers, the above charge of the court, to the effect that if the jury found that the fertilizers were not deficient in the chemical analysis or ingredients which the buyer specified then there would be no breach of warranty on the part of the seller and he would be entitled to recover the purchase-price, was tantamount to the direction of a verdict for the plaintiff.

■ The defendant contends that the court erred in charging the jury that "the measure of damages for a breach of warranty in the sale of personalty is the difference between the contract price and the actual value of the goods at the time and place of delivery." He contends that this excerpt was error because it excluded from the jury's consideration his claim for damages of the necessary expense incurred "in complying with the contract, that is, using the ferti-

■

lizer after it had been bought;" and because such instruction did not charge the jury as to the full measure of damages to which he might have been entitled, and therefore deprived him of the right to recover the indirect damages sustained in the use of the alleged worthless fertilizer. This charge incorrectly stated the law as to the measure of the direct damages in a case involving a breach of warranty by a vendor of personalty. The defendant could recover damages growing out of the transaction, such as the expense of hauling and distributing the alleged worthless fertilizer.

■ The court charged the jury: "While a plea of total failure of consideration includes partial failure of consideration, there must be evidence introduced showing the extent to which the consideration failed before a verdict can be rendered giving the defendant the benefit of a plea of partial failure of consideration." The defendant contends that this instruction was error as being inapplicable to the issues made by the pleadings and the evidence, in that there was no contention or evidence tending to show a partial failure of consideration, but that the defendant contended there was a total failure of consideration as respects some of the fertilizer. While the defendant contended that there was a total failure of consideration as respects some of the fertilizer, since he had admitted liability for the other portion of the fertilizer it can not be said that the issue of partial failure of consideration was not presented. The charge did not constitute reversible error.

■ The evidence did not demand a verdict for the plaintiff. There was evidence from which the jury would have been authorized to find that the consideration for 28 of the total of 48 items on the account, representing the various lots of fertilizer purchased, had failed.

■ The court erred in overruling the motion for new trial.

<em>Judgment reversed. Sutton, JJ., concurs.</em>

Felton, J., dissenting. There is no contention in this case that there was a shortage in plant food or commercial value. The fertilizer bought, though lumpy, still might have contained the ingredients specified on the tags and sacks. Therefore the only damages recoverable were those provided for by Code, § 5-1114. If there was an implied warranty that the fertilizer was fitted for the uses intended, the warranty was waived because the condition of the fertilizer was patent and the buyer used it after knowledge of

its alleged defective condition. Code, § 5-1117 refers only to wet fertilizer, and we do not have that kind in this case. Even if we did, it has been held by this court that to show immoral consideration the maker of a note for fertilizer must show that the fertilizer was inspected and found to be in wet and unsalable condition, and that the sale thereof had been prohibited by the Commissioner of Agriculture. *Bearden* v. *First National Bank of Rome,* 29 *Ga. App.* 129 (114 S. E. 78). The fact that there was an innocent transferee in that case would be immaterial, in my judgment, so far as the point decided is concerned. There is no evidence of any agreement in this case that would affect the plaintiff's right to collect. Before the buyer used all of the fertilizer the seller, after several complaints, told him that the fertilizer was his and that he would do nothing about it. I dissent from the judgment of reversal.